**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0640-24

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

C.J.S.,[1]

    Defendant-Appellant.

_____

> Argued March 3, 2026 – Decided August 5, 2026
>
> Before Judges Gooden Brown and DeAlmeida.
>
> On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Municipal Appeal No. 24-04.
>
> John Menzel argued the cause for appellant.
>
> Cheryl L. Hammel, Assistant Prosecutor, argued the cause for respondent (Bradley D. Billhimer, Ocean County Prosecutor, attorney; Samuel Marzarella, Chief Appellate Attorney, of counsel; Cheryl L. Hammel, on the brief).

PER CURIAM

---

[1] We use initials to preserve the confidentiality of domestic violence records, R. 1:38-3(d)(9), and the victim, R. 1:38-2(c)(6) and :38-3(d)(10).

Defendant C.J.S. appeals from a November 27, 2024 Law Division order convicting him after a trial de novo of driving while intoxicated (DWI), N.J.S.A. 39:4-50, and refusal to submit to a chemical breath test (Refusal), N.J.S.A. 39:4-50.4a. We affirm.

I.

At approximately 3:00 a.m., on November 27, 2022, Officer Nicholas Romeo of the Lakewood Police Department (LPD) was dispatched to a closed laundromat to meet a party parked at that location reporting he was the victim of domestic violence. On arrival, Romeo encountered defendant, who was on foot in front of the business. Another LPD officer arrived shortly before Romeo. Defendant led the officers to his car parked behind the building. Romeo saw defendant enter his car and exit the vehicle with the ignition key in his hand. A third LPD officer arrived a few minutes later.

Defendant told Romeo he and his girlfriend, D.L.P., were at a restaurant in Jackson Township earlier that morning when she saw a text message on his phone she thought was from another woman. Defendant told Romeo the couple had a dispute before "we left" the restaurant, which was about a mile and a quarter from the laundromat, in separate vehicles. Defendant said D.L.P. followed him, "pinned [him] in" on a street near the restaurant, but he "got

2

away." Defendant said he then "was swerving in and out" of side streets trying unsuccessfully "to avoid" D.L.P. He said he "dipped" into the laundromat parking lot and pulled behind the building. D.L.P. followed him, cornered his vehicle with hers, and exited her vehicle brandishing a gaffer's hook, which she used to smash the driver's side window of his car. At some point during the encounter, D.L.P. drove into the bumper of defendant's car. Defendant described the bumper hit as "when she tried to kill me."

Romeo observed damage to the right rear bumper of defendant's vehicle. In addition, Jackson Township Police officers went to D.L.P.'s home, where they observed damage to the front of her vehicle matching the damage to defendant's car. Romeo also observed defendant's driver's side front window was smashed.[2]

Defendant signed a domestic violence victim notification form. Romeo contacted a municipal court judge by telephone to facilitate defendant's application for a temporary restraining order (TRO) against D.L.P. pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35.

---

[2] The parties agree defendant called 9-1-1 to report he was a victim of domestic violence. The audio recording of defendant's 9-1-1 call was destroyed before trial. The record contains no evidence establishing the precise time of the call or the location from which defendant contacted 9-1-1.

A-0640-24

Defendant spoke to a municipal court judge over the phone and recounted the events of that morning. The judge granted defendant's TRO application.

During their interaction, Romeo noticed defendant's eyes were bloodshot and watery and his speech was slurred. Romeo also detected an odor of alcohol emanating from defendant's person and saw defendant open the trunk of his car, retrieve a bottle of mouth wash, and rinse his mouth.

According to Romeo, about an hour and fifteen minutes into the incident, the encounter transitioned from a domestic violence investigation to a DWI investigation. After defendant obtained the TRO, Romeo informed him he was under suspicion for DWI. Romeo asked defendant to perform standard field sobriety tests. Defendant refused, stating he could not perform the tests because he was a victim of domestic violence. He also repeatedly said he wanted to speak to his attorney. While refusing to take the tests, defendant said, "I was running for my life from a crazy woman with a fishhook."

Romeo arrested defendant and transported him to LPD headquarters. There, defendant refused to provide a breath sample for a chemical test. Romeo issued summonses charging defendant with: (1) DWI; (2) Refusal; and (3) careless driving, N.J.S.A. 39:4-97.

4

Before trial, defendant moved to dismiss the charges, arguing Romeo lacked probable cause to arrest him. On February 29, 2024, the court held a hearing on the motion, at which Romeo testified. The officer recounted his exchanges with defendant on the night he was arrested. During Romeo's testimony, defense counsel introduced copies of video and audio recordings from Romeo's body worn and dashboard cameras of the officer's encounter with defendant. Defense counsel described the videos as "each a little over one hour and forty minutes" and said, "One I'm going to ask the court to look at in full; the other we can probably look at in bits and pieces, because there are episodes within that video that really are not material to the case."

During the hearing, defense counsel played portions, but not all, of the recordings. Romeo's testimony, and the accompanying portions of the recordings, concerned the officer's interactions with defendant at the laundromat parking lot. No portion of the recordings depicting the officer's transportation of defendant to police headquarters or defendant's refusal to provide breath samples were played for the court.

The court admitted, without objection, a thumb drive containing the recordings as J-1 into evidence. At the conclusion of the hearing, the municipal prosecutor had the following exchange with the court:

5

> [MUNICIPAL PROSECUTOR]: We have done the highlights. And, Judge, I certainly invite you to watch the whole thing, if you'd like[.]
>
> THE COURT: I'd have to do it with everybody here on the record. So, at this point, unless anybody – if anybody else wants me to watch anything we'll watch it either today . . . or at another time.

Neither attorney requested the court review any footage beyond the portions played at the hearing.

Following closing arguments, the court issued an oral decision denying defendant's motion. With respect to Romeo's testimony, the court stated:

> And I do find that Officer Romeo was credible. He just told us what he knew. I watched his mannerisms, how he expressed himself. Didn't appear to overreach or in any way tr[y] to expand what might have happened. He just answered the questions and when he didn't know, he admitted that or he didn't remember. So[,] I'm satisfied that Officer Romeo was completely credible and the videotape pretty much backs that up because we saw it all with our own eyes.

The court noted it observed defendant on the recordings and found, "I did listen to him on the . . . video. And to my mind, I would have to agree with the State that his voice sounded slurred, as Officer Romeo testified earlier." In addition, the court found:

> Officer Romeo stated that [defendant's] eyes were bloodshot. [W]e couldn't see . . . at least not on the video, but . . . I believe that . . . Romeo is credible on

6

that observation. Slurred speech. We heard the slurred speech. There was an odor of alcohol. Obviously, . . . we don't know that.

. . . .

To my mind, watching [defendant], which is what the officers saw, clearly there's a reasonable and articulable suspicion that this gentleman was operating a motor vehicle while under the influence and also clearly there was probable cause for the arrest based upon that.

The municipal court trial was held on April 4, 2024. The parties agreed to incorporate the testimony and evidence admitted at the motion hearing into the trial record. No party requested the court review any portion of the recordings not played at the suppression hearing.

Romeo provided additional testimony at trial, including the following:

[MUNICIPAL PROSECUTOR]: Okay. And what did you do next with the defendant?

[OFFICER ROMEO]: He was placed under arrest and brought to Lakewood headquarters to be processed and booked.

[MUNICIPAL PROSECUTOR]: Okay. And once you got back to the booking room, can you just run us through the process of that?

[OFFICER ROMEO]: For a DWI, you bring them back to the booking room, read him Miranda,[3] general

---

3 Miranda v. Arizona, 384 U.S. 436 (1966).

A-0640-24

status statement, and also have him submit breath samples to the alcotest machine.

[MUNICIPAL PROSECUTOR]: Okay. And after you read him the <u>Miranda</u> and the general statement did he submit those breath samples?

[OFFICE ROMEO]: No. He refused.

At the conclusion of the trial, the court issued an oral decision convicting defendant of DWI and Refusal, and acquitting him of careless driving. The court reiterated its findings Romeo testified credibly and his testimony was corroborated by the recordings. The court again rejected defendant's argument the officer lacked probable cause to arrest him. The court found: "When the officers arrived, they observed that [defendant], his eyes were bloodshot. He had slurred speech. He had the odor of alcohol. He also, at some point, admitted . . . to having two drinks and that is on the videotape."

The court also concluded the record contained sufficient evidence to prove beyond a reasonable doubt the DWI charge. The court found:

> I watched the tape. And the tape . . . and anyone who watches the [recordings] in evidence, will see the behavior of [defendant], which probably would do more, I think, to convict [defendant] than even the testimony of Officer Romeo.
>
> We . . . all saw and observed [defendant's] behavior and I certainly can say, as a layperson, watching him, hearing him, hearing his manner, hearing

his movements, he appeared to me to be certainly under the influence of alcohol. As I said, he had slurred speech at that point to me . . . . He appeared drunk and he did admit . . . to two drinks, having two drinks.

I think taking all that together, clearly the State has proven beyond a reasonable doubt [defendant] operated his vehicle while under the influence of alcohol at the date, time and place of this incident.

The court also found defendant did not establish the common-law defense of necessity[4]:

What has been established, I think, beyond a reasonable doubt is that the defendant got into an argument. We don't know that it was a physical argument, as pointed out by the prosecutor, a verbal argument at [the] restaurant in Jackson . . . with his, at that point, girlfriend.

They apparently both had ingested some measure of alcohol at [the restaurant] and [defendant] wanted to get away, drove and I believe the testimony was that he kind of zigzagged through, didn't take a direct route, tried to lose his ex-girlfriend. . . . [They] ended up eventually . . . at the parking lot . . . [of] a . . . business, and the police were called. And at that point, that's where essentially the act of . . . domestic violence took place.

. . . .

---

[4] Because DWI and Refusal are not offenses under the Code of Criminal Justice, N.J.S.A. 2C:3-2(a), the statutory defense of necessity does not apply.

A-0640-24

. . . [Defendant] stated that he was involved in this altercation with his girlfriend with the . . . fishhook, which we know is some measure of a gaffer's hook.

. . . [I]t was admitted that the . . . damage to the vehicle happened at this scene [in Lakewood]. She used her car to block him in and smash the window with . . . the fishhook/gaffer's hook. So that . . . happened in Lakewood at the conclusion of this . . . incident, rather than his attempting to get away from physical harm at [the restaurant in Jackson].

The court concluded, "[I]t does appear to me that . . . there is no viable necessity defense in this matter. [Defendant] has not properly raised this and I think the testimony and . . . the videotape refute any elements of the necessity defense." The court found "the incident of the girlfriend backing into this car [(sic)] happened" at the laundromat in Lakewood, "rather than at the" restaurant in Jackson. The court continued:

I am also curious as to why someone who is alleging a necessity defense [who] believes he is under imminent physical harm would drive in the manner that [defendant] did and drive to this lot, rather than driving either to the [LPD] headquarters or to the Jackson Police headquarters or to some well[-]lit, open area. There are numerous of those in . . . this area of Jackson and Lakewood where everything would be out in the open.

So I am satisfied . . . that the defense has not put forth a proper necessity defense. And I am also satisfied that, based on the testimony, even if it were a proper necessity defense, and I don't believe it was

10

under these facts, that the State has beyond a reasonable doubt refuted that defense.

With respect to the Refusal charge, the court found the State proved defendant's guilt beyond a reasonable doubt. The court found:

> Officer Romeo did testify . . . that he asked the defendant to take the Breathalyzer. The defendant refused. He also did mention, did state, that he read the standard statement to the defendant. I also note that defendant had a prior DWI in 2009 and, to my mind, he knew and understood the procedures. [H]e clearly, to my mind, willfully, without any reason, simply refused to take the chemical test.

The court concluded the necessity defense did not apply to the Refusal charge: "Clearly, . . . the necessity test fails with regard to the DWI. It clearly, as a matter of logic and law, must fail with regard to the [R]efusal. I am satisfied that this is one entire incident . . . ."

Finally, the court found the State produced no evidence of reckless driving by defendant. Therefore, the court acquitted defendant of that charge.

The court sentenced defendant as follows: (1) for the DWI conviction, forfeiture of his driving privileges until he installs and maintains a breath alcohol ignition interlock device (IID) and for three months thereafter, twelve hours in the Intoxicated Driver Resource Center (IDRC), and fines and assessments; and (2) for the Refusal conviction, forfeiture of his driving

11

privileges until he installs and maintains an IID and for twelve months thereafter, twelve hours in the IDRC, and fines and assessments. The court ordered the sentences to be served concurrently. The court stayed the sentences pending defendant's appeal to the Law Division.

On August 14, 2024, following a trial de novo, the Law Division issued a written decision convicting defendant of DWI and Refusal. The court rejected defendant's argument Romeo lacked probable cause to arrest him. Having reviewed the videos, the court concluded they corroborated Romeo's testimony, which the municipal court found was credible, regarding the signs of intoxication the officer observed. Relying on Romeo's observations, as well as finding defendant's refusal to take the field sobriety tests as evidence of consciousness of guilt, the court found ample support for the conclusion the officer had probable cause to arrest defendant.

With respect to the sufficiency of the evidence to support defendant's DWI conviction, the court found:

> [T]he panoply of credible observational evidence presented to the Municipal Court, coupled with the [d]efendant's refusal to submit to a field sobriety test and subsequent refusal to take a breathalyzer test indicating a guilty mind, the [d]efendant also engaged in otherwise inexplicable behavior at the scene including retrieving mouthwash from his trunk and rinsing his mouth out in the middle of his conversation

12

with law enforcement – conduct that would only be logically explained by an effort to mask the alcohol on his breath and evidencing a guilty mind.

The court concurred with the municipal court finding "[d]efendant was 'certainly under the influence of alcohol' when operating his motor vehicle on the evening of the incident and the State made its case to demonstrate this beyond a reasonable doubt."

With respect to the Refusal charge, the court rejected defense counsel's argument Romeo's testimony that defendant was read the "general status statement," was insufficient to establish the officer read defendant his rights before he refused to give breath samples. The court found although the State failed to introduce a copy of the "standard statement" or elicit testimony from Romeo with respect to what the "general status statement" contained,

> [i]f [d]efense counsel wished to challenge the sufficiency of what Officer Romeo described as the "general statement" [(sic)], they could have asked Officer Romeo for additional information and created a full record of what, precisely, Officer Romeo was referring to when he stated he issued the [d]efendant the "general statement" [(sic)] but failed to do so at trial.

The court also found:

> While [d]efendant contends that this statement's contents were "neither identified nor offered into evidence below and cannot be considered by this [c]ourt," the video footage of Officer Romeo's body

camera was submitted into evidence before the Municipal Court as exhibit J-1 and that video, in its entirety, was accepted into evidence without objection. While only portions of this footage were played before the Municipal Court, the entirety of this footage was entered into evidence and is part of the Municipal Court record. Latter sections of that video footage recorded the exchange between the [d]efendant and Officer Romeo at the police station and recorded Officer Romeo's issuance of both <u>Miranda</u> warnings and a verbatim reading of the Attorney General's "standard statement" regarding breathalyzer administration under N.J.S.A. 39:4-50.2(e) to the [d]efendant at the police station before asking the [d]efendant to submit to a breathalyzer test . . . .

[(citations omitted).]

Defendant did not persuade the court his Refusal conviction was invalid because of his apparent confusion with respect to whether his right to remain silent justified his refusal to give breath samples. The court noted defendant did not raise this argument before the municipal court. In addition, the court observed defense counsel, in his closing argument in the municipal court, said defendant's refusal to submit breath samples was attributed to his "outrage" at being arrested when he called police as a victim of domestic violence. The court also found "the record is devoid of any evidence that [d]efendant was confused about his obligation to provide a breath sample at the police station."

14

The court rejected defendant's common-law necessity defense, finding the State disproved beyond a reasonable doubt defendant met the four prongs set forth in State v. Romano, 355 N.J. Super. 21, 29 (App. Div. 2002). First, the court found "[t]here is nothing in the present record to support this claim that the [d]efendant was assaulted at the restaurant. The only evidence on the current record is that the [d]efendant reported that he was 'being threatened physically' at the restaurant" during an argument with D.L.P.

Second, the court found even if defendant had been physically threatened at the restaurant, "there is nothing in this record to show that there was a recognizable likelihood of such a threat being carried out." The court noted defendant left the restaurant without injury and, when D.L.P. blocked him in at the laundromat, she damaged his vehicle, but did not physically harm him.

Third, the court found the record did not support a finding the emergency presented no reasonable opportunity for defendant to avoid injury without driving while intoxicated. The court found:

> If [D.L.P.] presented a threat to [d]efendant, there is no evidence that the [d]efendant could not have contacted police from the safety of the restaurant allowing responding law enforcement officers to address the issue at the restaurant. The [d]efendant could also have contacted the police from his car in the parking lot of the restaurant without operating the vehicle. This, presumably, would appear to have been a safer option

15

than driving, while impaired by the influence of alcohol, to a dark, unpopulated parking lot where [D.L.P.] eventually confronted him . . . . The [d]efendant had multiple options to avoid injury by [D.L.P.] without having to resort to an alcohol-impaired motor vehicle chase through the streets of Jackson and Lakewood . . . before contacting the police . . . .

Lastly, the court found defendant did not satisfy the fourth prong of the necessity defense because there is no evidence he suffered a physical injury. The court found

[t]he harm that the [d]efendant was fleeing was [D.L.P.] smashing his windshield and damaging the bumper of his car. Evaluating the "choice of evils" of a necessity defense, the property damage the [d]efendant was seeking to avoid to his vehicle does not begin to outweigh the danger his conduct created by engaging in an alcohol-impaired automobile chase . . . which placed the safety of the [d]efendant, [D.L.P.], and everyone on the roads . . . that evening in grave jeopardy.

[(citation omitted).]

Defendant moved for reconsideration of the August 14, 2024 decision. He argued the Law Division erred when it: (1) expanded the municipal court record by considering portions of the recording that were not played at the municipal court trial; and (2) shifted the burden of proof to defendant with respect to whether he was advised of his rights prior to refusing to submit breath samples.

16

On September 19, 2024, the court issued a written decision denying the motion. It found:

> [T]he entire video was marked and entered into evidence before the Municipal Court with the [d]efendant's consent, however, the [d]efendant contends that, because only certain portions of this video [were] played before the Municipal Court during trial, only those portions of the video may be considered by this [c]ourt on appeal.
>
> Although technically designated as an appeal, the de novo proceeding on the matter before this [c]ourt is more akin to a trial than an appeal. At a trial de novo, the court is required to decide the case completely anew and make its own findings of fact and conclusions of law but defer to the Municipal Court's credibility findings.
>
> [(citations and quotations omitted).]

The court found because the entirety of J-1 was admitted as evidence in the Municipal Court, it was obligated to review the entirety of the recordings on J-1 to make an independent determination of whether the State had proven the charges beyond a reasonable doubt. The recordings on J-1 included a recording of Romeo reading a statement detailing defendant's rights and potential penalties with respect to submitting breath samples after a DWI arrest. The court recited into the record the statement the court heard Romeo read to defendant. The court found Romeo's statement was an appropriate advisement of rights given to

17

defendant before he was requested to give breath samples and defendant gave a clear and unambiguous refusal to submit breath samples.[5]

The court rejected defendant's argument it shifted the burden of proof to him. Although acknowledging it stated defense counsel failed to ask Romeo questions designed to elicit the exact contents of the "general status statement" he read to defendant, the court found the State produced sufficient evidence, including the recording, to establish beyond a reasonable doubt what Romeo said to defendant before asking him for breath samples.

In a November 27, 2024 judgment, the court denied defendant's motion for reconsideration of the August 26, 2024 decision, and adjudicated him guilty of DWI and Refusal. The court sentenced defendant as follows: (1) for DWI,

---

[5] The exact contents of J-1 were not described on the record in the municipal court or Law Division. In addition, J-1 was not submitted to this court. We received from the parties only copies of two recordings which appear to have been generated by Romeo's body worn camera and dashboard camera. Those recordings are approximately an hour and forty minutes in length, which is consistent with the description given by defendant's counsel of the recordings he presented in the municipal court. The recordings depict Romeo's interaction with defendant in the laundromat parking lot. However, both recordings end when Romeo arrives at LPD headquarters with defendant. They contain no footage of Romeo and defendant inside LPD headquarters. As a result, we have not reviewed the recording of Romeo advising defendant of his rights before asking for breath samples. In the absence of argument to the contrary, we assume the recording of Romeo and defendant interacting at LPD headquarters viewed by the Law Division was on J-1, and Romeo read a complete and accurate statement of rights to defendant.

forfeiture of his driving privileges until he installs and maintains an IID, and for three months thereafter, twelve hours at the IDRC, and fines and assessments; and (2) for Refusal, forfeiture of his driving privileges until he installs and maintains an IID, and for twelve months thereafter, twelve hours in the IDRC, and fines and assessments. The court ordered the sentences to be served concurrently. The court denied defendant's motion for a stay of sentence pending appeal. This appeal followed.

Defendant raises the following arguments.

POINT I

WHEN BALANCED AGAINST THE PUBLIC POLICY OF ASSISTING THE VICTIMS OF DOMESTIC VIOLENCE AND ENFORCING DWI LAWS, POLICE IN THIS CASE LACKED PROBABLE CAUSE ON WHICH TO ARREST DEFENDANT FOR DWI.

POINT II

WITH DEFENDANT PRESENTING "SOME EVIDENCE" OF DOMESTIC VIOLENCE AND NECESSITY, THE STATE FAILED TO DISPROVE THE NECESSITY DEFENSE BEYOND A REASONABLE DOUBT.

POINT III

THE REFUSAL CHARGE WAS INTEGRALLY RELATED TO, AND NOT SO ATTENUATED

19

FROM, THE DWI CHARGE THAT IT SHOULD BE DISMISSED.

POINT IV

THE STATE FAILED TO ESTABLISH WHAT, IF ANY, ADVICE DEFENDANT WAS GIVEN CONCERNING HIS RIGHTS AND OBLIGATIONS AS TO SUBMITTING BREATH SAMPLES.

POINT V

THE LAW DIVISION JUDGE IMPERMISSIBLY EXPANDED THE MUNICIPAL COURT RECORD BY RELYING ON PARTS OF VIDEO NEITHER OFFERED IN EVIDENCE IN THE MUNICIPAL COURT TRIAL NOR RELIED ON BY THE MUNICIPAL COURT JUDGE, THUS DEPRIVING DEFENDANT OF THE RIGHT TO BE PRESENT AT EVERY CRITICAL STAGE OF THE PROCEEDINGS AGAINST HIM.

POINT VI

THE LAW DIVISION JUDGE IMPERMISSIBLY SHIFTED THE STATE'S BURDEN OF PROVING EVERY ELEMENT OF THE BREATH TEST REFUSAL OFFENSE BEYOND A REASONABLE DOUBT BY STATING THAT THE DEFENSE HAD AN OBLIGATION TO QUESTION THE ADVISING OFFICER AS TO WHETHER HE READ DEFENDANT A STANDARD STATEMENT.

POINT VII

DEFENDANT'S REPEATED AND CONSISTENT ASSERTIONS OF HIS RIGHT TO COUNSEL THROUGHOUT HIS ENCOUNTER WITH POLICE

A-0640-24

ESTABLISHED A VALID CLAIM OF CONFUSION
SUFFICIENT TO CONSTITUTE AN AFFIRMATIVE
DEFENSE TO THE REFUSAL CHARGE.

## II.

On appeal from a municipal court to the Law Division, the review is de novo on the record. R. 3:23-8(a)(2). The Law Division judge must make independent findings of fact and conclusions of law but defers to the municipal court's credibility findings. State v. Robertson, 228 N.J. 138, 147 (2017).

We, however, do not independently assess the evidence on an appeal from the Law Division's de novo review of the municipal court conviction. State v. Locurto, 157 N.J. 463, 471-72 (1999). Our "standard of review of a de novo verdict after a municipal court trial is to determine whether the findings made could reasonably have been reached on sufficient credible evidence present in the record, considering the proofs as a whole." State v. Ebert, 377 N.J. Super. 1, 8 (App. Div. 2005) (internal quotations marks and citation omitted).

The rule of deference is more compelling where, as here, the municipal and Law Division judges made concurrent findings. Locurto, 157 N.J. at 474. "Under the two-court rule, appellate courts ordinarily should not undertake to alter concurrent findings of facts and credibility determinations made by two lower courts absent a very obvious and exceptional showing of error." Ibid.

21

"Therefore, appellate review of the factual and credibility findings of the municipal court and the Law Division 'is exceedingly narrow.'" State v. Reece, 222 N.J. 154, 167 (2015) (quoting Locurto, 157 N.J. at 470). But, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Twp. of Manalapan, 140 N.J. 366, 378 (1995).

A.      Probable Cause.

Probable cause is "consistently characterized . . . as a common-sense, practical standard . . . ." State v. Novembrino, 105 N.J. 95, 120 (1987). It is met when police have "a 'well grounded' suspicion that a crime has been or is being committed." State v. Waltz, 61 N.J. 83, 87 (1972) (quoting State v. Burnett, 42 N.J. 377, 387 (1964)). The United States Supreme Court similarly described probable cause as a "practical, nontechnical conception." Illinois v. Gates, 462 U.S. 213, 231 (1983) (quoting Brinegar v. United States, 338 U.S. 160, 176 (1949)). Probable cause requires more than mere suspicion; it requires a showing of a "fair probability" illegal activity is taking place. State v. Demeter, 124 N.J. 374, 380-81 (1991) (quoting Gates, 462 U.S. at 238). Courts must base a probable cause determination on the totality of the circumstances

22

and consider the probabilities.  State v. Jones, 179 N.J. 377, 389 (2004) (citing

Schneider v. Simonini, 163 N.J. 336, 361 (2000)).

Defendant does not challenge the court's conclusion the indicia of intoxication observed by Romeo were sufficient to constitute probable cause to arrest him for DWI.  He instead argues:

> This case calls upon this [c]ourt to balance whether society's legitimate interests require the seizure of the particular individual.  Those interests are the enforcement of DWI laws on the one hand and the protection of domestic violence victims on the other.  So, was it reasonable and prudent to seize [defendant] and to arrest him for DWI after he sought protection in a domestic violence incident?

In support of his argument, defendant relies on N.J.S.A. 2C:25-18, which sets forth the legislative findings in the PDVA.  Specifically, it was the "intent of the Legislature to assure the victims of domestic violence the maximum protection from abuse the law can provide" and declare "the primary duty of a law enforcement officer when responding to a domestic violence call is to enforce the laws allegedly violated and to protect the victim."  N.J.S.A. 2C:25-18.  He argues:

> Given the totality of these unusual circumstances, police action here revictimized a victim of domestic violence, violated the [l]egislative purpose and public policy of protecting victims of domestic violence, and aggravated a situation defused of any

DWI threat that [defendant] may have posed. His DWI arrest was imprudent and unreasonable. Consequently, this [c]ourt should find no probable cause, both as a matter of constitutional law and as an element of the refusal offense.

We acknowledge the legislature intended to broadly protect victims of domestic violence from abuse through enactment of the PDVA. However, nothing in N.J.S.A. 2C:25-18, or any other provision of the PDVA, prohibits a police officer from arresting a domestic violence victim when the officer has probable cause to believe the victim committed an offense. The statutory protections for domestic violence victims do not extend that far.

In other contexts, the legislature established statutory immunity from criminal liability for persons who call 9-1-1 for assistance. See N.J.S.A. 2C:35-30(a) to (c) (providing immunity from arrest, prosecution, or conviction for specified drug-related crimes for persons who, in good faith, seek medical assistance for someone experiencing a drug overdose) and N.J.S.A. 2C:35-31(a) to (c) (providing immunity from arrest, prosecution, or conviction for specified drug-related crimes for persons who experience a drug overdose and either, in good faith, seek medical assistance, or are the subject of a good faith request for medical assistance by another person). The legislature has not enacted a similar provision protecting victims of domestic violence who seek police assistance.

Moreover, N.J.S.A. 39:5-25 provides: "A law enforcement officer may arrest without a warrant any person who the officer has probable cause to believe has operated a motor vehicle in violation of [N.J.S.A. 39:4-50] . . . , regardless of whether the suspected violation occurs in the officer's presence." There is no exception in the statute applicable when an officer acquires probable cause for a DWI arrest when responding to a domestic violence victim's request for assistance.

We are also not persuaded defendant's arrest violated constitutional protections. It is commonly accepted in criminal law that a police officer who observes evidence of a crime while lawfully present for other purposes may effectuate an arrest for that crime. See State v. Gonzales, 227 N.J. 77, 90 (2016) ("The plain-view exception" to the warrant requirement "has long been part of our search-and-seizure jurisprudence . . . ."). Defendant called police to the laundromat parking lot to report he was the victim of domestic violence. While assisting defendant and facilitating his request for a TRO, Romeo observed evidence of defendant's unlawful behavior. Defendant's subsequent arrest was consistent with constitutional norms.

Defendant, in effect, argues the arrest of a person seeking police assistance as a victim of domestic violence should be precluded as a matter of

25

public policy. The argument for such an exception is properly addressed to the elected branches of government, which have previously identified limited circumstances in which a person seeking assistance via 9-1-1 is immune from arrest and prosecution.

B. Necessity Defense.

"The common-law defense of 'necessity' is often referred to as the 'choice-of-evils' defense." State v. Tate, 102 N.J. 64, 73 (1986). "Conduct that would otherwise be criminal is justified if the evil avoided is greater than that sought to be avoided by the law defining the offense committed, or, conversely, if the conduct promotes some value higher than the value of compliance with the law." Ibid. As the Court explained: "The defense is based on public policy. In essence it reflects a determination that if, in defining the offense, the legislature had foreseen the circumstances faced by the defendant, it would have created an exception. It would have balanced the competing values and chosen the lesser evil." Id. at 73-74.

There are four elements of the common-law defense of necessity:

> (1)    There must be a situation of emergency arising without fault on the part of the actor concerned;
>
> (2)    This emergency must be so imminent and compelling as to raise a reasonable expectation of harm,

A-0640-24

either directly to the actor or upon those he was protecting;

(3) This emergency must present no reasonable opportunity to avoid the injury without doing the criminal act; and

(4) The injury impending from the emergency must be of sufficient seriousness to outmeasure the criminal wrong.

[Romano, 355 N.J. Super. at 29 (quoting State v. Tate, 194 N.J. Super. 622, 628 (App. Div. 1984), rev'd on other grounds, 102 N.J. 64 (1986)).]

A "[d]efendant must come forward with some evidence of the defense, but the State bears the ultimate responsibility to disprove the defense beyond a reasonable doubt." Id. at 36.

Our holding in Romano guides our analysis of defendant's necessity claim. There, an officer observed Romano operating a car on a roadway without headlights at approximately 2:15 a.m. Id. at 24. The car was about 350 yards from the parking lot of Bucco's restaurant. Ibid. The officer stopped the vehicle and approached the driver's side window where he saw Romano with his face covered in blood, bleeding profusely from the nose, physically shaken and frightened. Ibid. Romano told the officer he was "scared" and had been "jumped by some individuals" in the parking lot of Bucco's. He stated he was happy to see the officer and that he "needed help." Ibid.

27

At the hospital where Romano was transported for medical treatment, the officer smelled alcohol on his breath.  Id. at 25.  A blood test revealed Romano had a blood alcohol level above the legal limit.  Ibid.  The officer charged Romano with DWI.  Id. at 27.

At trial, Romano testified he was in the parking lot waiting for his girlfriend when he was struck from behind by two men, who kicked, punched, stepped on, beat him, and held him against his car while a third man struck him in the face.  Id. at 26.  Romano broke free, entered his vehicle, and locked the doors.  Ibid.  The attackers jumped on the hood of the car, and continued to threaten him, including stating, "you're dead after this."  Ibid.  With no one else in the parking lot and no cellphone to call for help, Romano started the car and exited onto the street, where he saw the patrol car and was thankful to have encountered a police officer.  Ibid.  Romano testified the officer's presence may have saved his life.  Ibid.

Romano was convicted of DWI in the municipal court, which rejected his common-law necessity defense.  Id. at 27.  The Law Division considered Romano's claim of necessity to be an assertion of the common-law defense of duress, which it rejected.  Ibid.

We reversed, finding Romano established necessity.  Id. at 36.  We held:

[Romano] was attacked by three unknown men. Thus, he did not create or participate in the circumstances bringing about the harm he sought to avoid. Furthermore, . . . [Romano] had no other reasonable alternatives available to him . . . . In addition, the gravity of the harm [Romano] faced . . . was significant[] . . . .

. . . .

. . . [A]t 2:18 a.m., [Romano] was brutally beaten and was faced with three angry men who were intent on continuing to beat him. [Romano's] car was being shaken, kicked, and rocked, with his attackers threatening to kill him. [Romano] had no realistic alternative but to violate the DWI statute.

[Id. at 32-33, 35.]

We found the necessity defense was established, concluding the "facts [were] so bizarre and remote from the public policy underlying the law that even a [c]ourt as committed as this one to the strict enforcement of the drunk-driving statutes can pause to make certain that no injustice has been done." Id. at 33 (quoting State v. Fogarty, 128 N.J. 59, 74 (1992)).

Having reviewed the record, we conclude defendant did not establish any of the four elements of the common-law necessity defense. The critical point of our inquiry is what transpired at the Jackson restaurant in the moments before defendant entered his vehicle, pulled out of the parking lot, and drove – for more than a mile and a quarter – on the public roadways. Defendant began his offense

29

of DWI when he took operational control of his vehicle while intoxicated at the restaurant, likely when he entered the vehicle with the intent to drive away. See State v. Ticshio, 107 N.J. 504, 513 (1987) (holding "operation" of a vehicle under N.J.S.A. 39:4-50 can be found from evidence that would reveal "a defendant's intent to operate a motor vehicle."). Thus, we must examine whether he produced some evidence of a threat to his person before he entered his vehicle in Jackson that was sufficient to outweigh the significant danger he posed to the public when he operated his vehicle while intoxicated. Romano, 355 N.J. Super. at 26.

Critically, defendant produced no evidence D.L.P. brandished the gaffer's hook at the restaurant before he decided to drive away. The only evidence of what occurred at the Jackson restaurant before defendant left in his vehicle is derived from his statements on the police recording devices at the Lakewood parking lot. Those statements, however, primarily concern what happened in Lakewood – defendant claims D.L.P. cornered his car and smashed his driver's side window with a gaffer's hook. In addition, defendant's recorded statements describe him being chased by D.L.P. through the streets of Jackson and Lakewood until he entered the laundromat parking lot.

While refusing to provide breath samples, defendant said, "I was running for my life from a woman with a fishhook." He did not, however, say D.L.P. threatened him with the gaffer's hook before he entered his vehicle in the Jackson parking lot while intoxicated and prepared to drive away – the moment he first violated N.J.S.A. 39:4-50. D.L.P. may have first threatened defendant with the gaffer's hook while chasing him after he drove away from the restaurant or at the Lakewood parking lot.

Even if we were to assume D.L.P. first brandished the gaffer's hook in Jackson, defendant produced no evidence his only reasonable opportunity at that time to avoid physical harm was to drive while intoxicated. For example, if D.L.P. first brandished the gaffer's hook in the restaurant, defendant may have had the opportunity to defuse the threat by seeking the assistance of staff, other patrons, or the police. If D.L.P.'s threat was first made in the restaurant parking lot, defendant may have had the opportunity to return to the restaurant for assistance or to escape D.L.P.

The record stands in sharp contrast to the evidence in Romano, where the defendant was in the midst of an ongoing brutal assault by three assailants, one of whom was on the hood of his vehicle threatening his life, when he drove a few hundred yards in the direction of a patrol car to escape further injury.

31

Romano produced evidence of an imminent physical threat at the moment he took operational control of his vehicle while intoxicated.

Nor did defendant produce evidence it was necessary for him to drive for more than a mile and a quarter, zigzagging through the streets of two towns, while D.L.P. followed him. An extended car chase in the dark early morning hours, led by an intoxicated driver, poses a significant threat to both drivers and the public. The record contains no evidence defendant's first opportunity to stop the chase was pulling into the rear parking lot of a closed business more than a mile and a quarter from where the chase began. In fact, defendant told the officers in Lakewood D.L.P. "pinned [him] in" on a street near the restaurant, but he "got away." He provided no evidence, however, his only option the first time D.L.P. impeded his vehicle was to "get away" by continuing to drive while intoxicated.

Finally, defendant produced no evidence the physical harm threatened by D.L.P. – the exact nature of D.L.P.'s threat at the restaurant is not in the record – was sufficiently serious to outweigh the danger he posed to the community by engaging in a long drunken car chase along public roadways. The eradication of drunk drivers from New Jersey roadways is the chief purpose of our drunk driving laws. Tischio, 107 N.J. at 512. The threat of harm of injury and death

A-0640-24

to the public defendant created was significant. Nothing in the record proves that threat was outweighed by a credible threat of physical harm to defendant. In fact, when D.L.P. succeeded in cornering defendant in the laundromat parking lot she damaged his car, but did not harm him physically. The record does not establish the evil defendant sought to avoid was greater than the evil the legislature intended to ameliorate when it enacted N.J.S.A. 39:4-50.

C.    <u>Refusal Charge.</u>

N.J.S.A. 39:4-50.2(a) provides:

> Any person who operates a motor vehicle on any public road, street or highway or quasi-public area in this State shall be deemed to have given his consent to the taking of samples of his breath for the purpose of making chemical tests to determine the content of alcohol in his blood . . . .

There are four elements to establish Refusal under N.J.S.A. 39:4-50.4a: (1) the arresting officer had probable cause to believe that the defendant was operating a vehicle under the influence of alcohol; (2) the defendant was arrested for DWI; (3) the officer requested the defendant submit to a chemical breath test and informed the defendant of the consequences of refusing to do so; and (4) the defendant thereafter refused to submit to the test. <u>State v. Marquez</u>, 202 N.J. 485, 503 (2010).

N.J.S.A. 39:4-50.2(e) provides: "The police officer shall . . . inform the person arrested of the consequences of refusing to submit to such test in accordance with [N.J.S.A. 39:4-50.4a]. A standard statement, prepared by the chief administrator shall be read by the police officer to the person under arrest." The legislature authorized the standard statement as a procedural device to inform motorists of "the mandatory nature of the [breath] test, their limited rights to counsel for purposes of the test, and the need for unequivocal, affirmative consent." State v. Widmaier, 157 N.J. 475, 489 (1999).

Romeo testified he read defendant a "general status statement" before requesting breath samples. Immediately thereafter, the municipal prosecutor asked Romeo if, after reading defendant "the general statement[,]" he provided breath samples. Romeo replied, "No." This exchange suggests Romeo was referring to the general statement of rights adopted by the Attorney General in accordance with N.J.S.A. 39:4-50.2(e) when he previously said, "general status statement."

The municipal prosecutor did not ask Romeo to identify the statement to which he referred or to detail the contents of the statement he read to defendant. However, the parties do not dispute Romeo's recitation of the Attorney General's

34

statement to defendant at LPD headquarters was recorded on Romeo's body worn camera and the recording was included on J-1.

The record establishes the municipal court did not review the recording of Romeo reading a statement to defendant at LPD headquarters. The court informed counsel it would not review any portion of the recordings on J-1 not played in court. However, it is not disputed the Law Division reviewed the recording of Romeo reading the Attorney General's general statement of rights to defendant before asking for breath samples.

Defendant argues it was inappropriate for the Law Division to consider that portion of the recording because it was not played in the municipal court. We disagree. While only portions of the recordings on J-1 were played in the municipal court, defendant stipulated to the admission of all the evidence on J-1, including Romeo's recitation of the standard statement to defendant. The Law Division's de novo review of the record properly included all evidence admitted in the municipal court, including Romeo's reading of the Attorney General's standard statement to defendant.[6]

---

[6] The State submitted in its appendix a written copy of the Attorney General's standard statement on which defendant wrote "I refuse without my attorney present." That document, although produced in discovery, was not admitted as evidence at trial. The State did not move to supplement the record on appeal, and its submission of the document was not appropriate.

We are not persuaded by defendant's argument the Law Division shifted the burden of proof to defendant when it noted his counsel did not question Romeo with respect to the exact contents of the statement he read to defendant. While we agree defendant had no obligation to establish the rights-notification element of the Refusal offense, having reviewed the Law Division's decision in its entirety, we are confident the court placed the burden of proof beyond a reasonable doubt of every element of the Refusal offense on the State.

Finally, given we concur with the Law Division's conclusion defendant did not establish the common-law necessity defense for his DWI conviction, we also agree he did not establish the defense for his Refusal conviction. DWI and Refusal are separate violations. Even under defendant's version of events, at the time he was asked to submit breath samples, no impending emergency existed. Notably, when enacting N.J.S.A. 39:4-50.2(a), the legislature foresaw no situation justifying a motorist's refusal to submit to a breathalyzer test. Nothing in the statute suggests the legislature intended to leave the decision of whether to comply with a lawful request to submit breath samples to the subjective determination of an intoxicated driver that their operation of a vehicle on the public roadways was justified by necessity.

We have considered defendant's remaining arguments, including his claim to have been confused when he refused to provide breath samples, see Widmaier, 157 N.J. at 487, and conclude they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-0640-24